# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# ALBANY DIVISION

| | |
|---|---|
| **GREGORY GILLILAN,** : | |
| : | |
| **Plaintiff,** : | |
| : | **CIVIL ACTION FILE** |
| VS. : | **NO. 1:06-CV-91 (WLS)** |
| : | |
| **DR. DWAYNE AYERS, et al.,** : | |
| : | |
| **Defendants.** : | |

## RECOMMENDATION

This is a § 1983 action brought by a Georgia State prisoner, who at the time of the alleged circumstances giving rise to lawsuit, was an inmate at Calhoun State Prison in Morgan, Georgia. The three named defendants, Dr. Dwayne Ayers, Nurse Alisha Porter and Nurse Rhonda Wright, are or were on the Medical Staff of that prison at that time.

To refer to this plaintiff as a recreational or frequent filer is a gross understatement. It is individuals like the plaintiff who brought about the need for the passage of the Prison Litigation Reform Act as a result of his blatant misuse of the *in forma pauperis* and *pro se* litigation processes. A search conducted on PACER reveals that since June 16, 2005, this plaintiff has filed a total of eighty-seven civil actions, nineteen in the Southern District of Georgia and sixty eight in this Court. At this time only this case and one other remain pending in this court.

Plaintiff evidently has Hepatitis C and also suffers from some type of seizure disorder. In a nutshell his complaints against defendant Dr. Ayers is that this defendant will not or does not refer him to a specialist in treating this condition as often as the plaintiff would like. Further, although defendant Ayers prescribed medication for the treatment of his illness, he did not prescribe the particular medication that plaintiff wanted. As to defendants nurses Porter and

Wright his complaint is that they don't always give him the medication on a regular basis. Finally, as the result of not getting the seizure medication he wanted, he alleges that he had a seizure which resulted in a fall causing an injury to his head.

Presently pending herein is a motion for summary judgment filed on behalf of all defendants. Defendant Wright has not acknowledged service of the complaint, nor has she been personally served with a copy of the complaint. Thus, she is appearing specially for the purpose of filing her motion for summary judgment without submitting to the jurisdiction of the court. The court gave the plaintiff the required notice of the filing of the motion for summary judgment and of his right to respond in opposition to the granting of the motion. That notice also gave plaintiff notice of the increased likelihood of the motion being granted in the absence of a response. Plaintiff's copy of that notice has not been returned as undeliverable, leading to the conclusion that he received the notice. For whatever reason plaintiff has not responded in opposition to the granting of the motion, a fact which in the opinion of the undersigned should preclude consideration of any objections to the recommendation that the motion be granted should that be the case.

***Summary Judgment Standard***

In determining a summary judgment motion, the inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. Welch v. Celotex Corp., 951 F.2d 1235 (11th Cir. 1992)(citing Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). However, once the movant demonstrates the absence of a genuine issue of material fact, the nonmovant must "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at

trial." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the nonmoving party has the burden of proof at trial, the moving party may carry its burden at summary judgment either by presenting evidence negating an essential element of the nonmoving party's claim, or by pointing to specific portions of the record which demonstrate that the nonmoving party cannot meet its burden of proof at trial. Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-608 (11th Cir. 1991).

*Local Rule 56*

For purposes of this recommendation the following portion of this rule is pertinent:

> The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine issue to be tried. Response shall be made to each of the movant's numbered material facts. <u>All material facts contained in the moving party's statement which are not specifically controverted by the respondent in respondent's statement shall be deemed to have been admitted, unless otherwise inappropriate.</u> (Emphasis added).

Inasmuch as plaintiff did not submit "a separate and concise statement of material facts . . . to which [he] contends there exists a genuine issue to be tried . . . all material facts contained in the moving party's statement . . . shall be deemed to have been admitted, unless otherwise inappropriate." Id.

The undersigned feels compelled to point out certain statements contained in plaintiff's complaint and his supplement thereto, which if correctly interpreted, essentially destroys his credibility. In his complaint plaintiff makes the following statement. "Ayers was ordered by the court to provide medical by law for the cancer virus. Case Gillian v. Ayers, No. 1:05-cv-80(WLS)." (R. at 2, p. 5). In his supplement he states, "[m]edicine for Hepititis -C cancer was ordered by the court to be provided by law case Gillian v. Ayers, No. 1:05-cv-80(WLS." (R. at 7). The undersigned has reviewed the electronic docket of the above referenced case and learned that

3

on August 1, 2006, the undersigned recommended that the motion for summary judgment filed therein by defendant Ayers be granted, (R. at 31) and further, that the recommendation was adopted and made the order of the court on September 20, 2006, (R. at 35). The undersigned can find no indication in that record of any court order requiring defendant Ayers to provide plaintiff with any particular medication, thus forcing the conclusion that plaintiff is simply intentionally misrepresenting the outcome of that case.

Insofar as plaintiff's specific complaints regarding defendant Ayers are concerned, he alleges that this defendant would not allow him to have a Telemed Conference every ninety days with an infectious disease specialist as required and he further alleges that he did not get the medication he wanted or feels was suggested by the infectious disease specialist, and that he did not get the right seizure medicine (R. at 2, p. 5 - unverified complaint, R. at 7 - unverified supplement to complaint). His complaint against defendant Porter is that she withheld his prescribed medication on the dates of August 25, 29, 30, 2005, September 9, 2005, April 4, 5, 2006 and June 13, 2006. It also appears that he makes the same complaint for this defendant for the dates of May 4 and 5, 2006, as well as June 12, 2006. He complains that defendant Wright withheld his prescribed medication on the dates of August 1, 27, and 28, 2005. (R. at 2, pp. 4, 7).

The following portions of the defendant's statement material facts as to which there is no issue, and which are deemed admitted in the absence of anything to the contrary from the plaintiff are particularly relevant here. The defendants' statement of material facts appears in the record at document number 23.

> 2. Inmate Gillilan's institutional medical records reflect that he underwent treatment for Hepatitis C in 2005 and 2006; however, his institutional medical records do not reflect that he has ever been diagnosed with any form of cancer. Inmate's Gillilan's institutional records also show that he was housed at Calhoun State Prison from March 8, 2005 to July

4

6, 2006. (Ayers Affidavit, para. 4; Plaintiff's institutional medical records).

3. The treatment for Hepatitis C is constantly evolving based upon the most-current clinical research and involves a great deal of clinical judgment. In determining whether an inmate should undergo the Hepatitis C, Dr. Ayers always considers and advises the inmate on numerous factors, including the fact that (1) the treatment requires taking medication for 48 weeks, and the inmate will most likely experience severe flu-like symptoms for the entire treatment period (2) some inmates do not respond at all to the treatment (3) even if the inmate completes the entire 48 week treatment, his chances of completely eradicating the Hepatitis C virus are less than 50 percent. A high portion of inmates who begin the treatment do not complete it because of the side effects, and therefore, it is not uncommon for inmates to be worse off after beginning and not completing the treatment. (Ayers Affidavit, para. 5).

4. Hepatitis C has four different levels, beginning with level one and proceeding to level four, which is cirrhosis of the liver. A patient's stage represents the level of fibrosis, or scarring, on the liver from the Hepatitis C-induced inflammation. It typically takes eight to ten years for a patient to proceed from one stage to the next, and thus it may take three to four decades for a patient to reach stage four. However, if an inmate does not drink alcohol (which is not permitted in the Georgia Department of Corrections facilities) and does not take any medication that inflames the liver, it is not uncommon for the progression of the disease simply to stop. (Ayers Affidavit, para. 6).

5. As a physician who is employed by the Georgia Department of Corrections and who practices medicine within the prison setting, Dr. Ayers is very familiar with the Hepatitis C virus, its symptoms, and its treatment. Dr. Ayers regularly treat inmates for the Hepatitis C virus and has done so for a number of years. The Georgia Department of Corrections employs outside medical consultants who are Infectious Disease specialists to assist the various Medical Directors in their assessment and treatment of inmates with Hepatitis C, and Dr. Ayers holds telemedicine conferences with the Infectious Disease specialist on a frequent basis. However, when Dr. Ayers treats an inmate treatment for the Hepatitis C virus by personally overseeing his medical treatment, he has the ultimate authority over determining the inmate's course of treatment. As the inmate's treating physician, Dr. Ayers is required to refer the inmate to the Infectious Disease consultant before the inmate starts his Hepatitis C treatment and again at twelve weeks after starting the treatment. However, if the inmate's treatment is going well after the twelve-week consult, Georgia Department of Corrections policy does not require that Dr. Ayers refer the inmate to the Infectious Disease consultant again. (Ayers Affidavit, para. 7).

6. On April 12, 2005, Dr. Ayers sent a Hepatitis C Pre-Therapy Checklist on inmate Gillilan to the office of Dr. Joseph Paris, the Statewide Medical Director of the Department of Corrections. (Ayers Affidavit, para. 8; Pre-Therapy Checklist of 4/12/05).

7. On July 21, 2005, inmate Gillilan was seen by Infectious Disease Telemedicine Consultant Dr. Presnell for an initial consultation. (Ayers Affidavit, para. 8; note of

5

7/21/05).

8. On July 24, 2005, Dr. Paris' office approved inmate Gillilan for the Hepatitis C treatment. (Ayers Affidavit, para. 8; note of 7/24/05).

9. On August 9, 2005, Dr. Ayers referred inmate Gillilan to the Infectious Disease Consultant for a routine follow up of his Hepatitis C to be scheduled 12 weeks from August 25, 2005, the date on which he began the treatment. (Ayers Affidavit, para. 9; note of 8/9/05).

10. On November 28, 2005, Inmate Gillilan was seen by Dr. Presnell, the Infectious Disease telemedicine consultant, who noted that inmate Gillilan was having a good response to the medication at 12 weeks. Inmate Gillilan's viral load was undetectable and it was determined that he could complete the treatment. Because Inmate Gillilan showed a good response to the medication, Dr. Ayers was not required to refer him to an Infectious Disease consultant again during the course of his treatment. Inmate Gillilan continued on the Hepatitis C treatment until September 2006. (Ayers Affidavit, para. 10; note of 11/28/05).

13. Ms. Porter is a Licensed Practical Nurse licensed by the State of Georgia and has worked at Calhoun State Prison since July 7, 1998. As a nurse at Calhoun State Prison, Ms. Porter's job responsibilities include providing inmates with medication. If an inmate's prescription calls for the medical staff to give him his medication on a daily basis, an inmate must walk to the medical department at Calhoun State Prison at certain times of the day, which is known as "pill call." At pill call, a nurse will hand him his medication. If an inmate does not appear at pill call, he will not receive his medication for that scheduled time. The Medical Department at Calhoun State Prison maintains a separate Medication Administration Record ("MAR") on each inmate on which the nurses record whether or not an inmate receives his medication at each scheduled time and the reason why an inmate may not receive his medication. As a matter of practice, Ms. Porter always accurately records in an inmate's MAR whether they receive their medication at each scheduled time and the reason why an inmate may not receive his medication. (Porter Affidavit, paras. 3, 4).

14. Inmate Gillilan's MAR shows that for the relevant dates to the issues of this lawsuit, inmate Gillilan was receiving as his Hepatitis C treatment a 180 mg shot of Pegasus once a week, plus 600 mg of Ribavirin each morning and 400 mg of Ribavirin each night. At no time has Ms. Porter ever denied inmate Gillilan his medication if he appeared at pill call, and at no time has Ms. Porter ever ignored or been deliberately indifferent to his medical needs. (Porter Affidavit, para. 5).

15. A patient receiving the Hepatitis C course of treatment should receive his Ribavirin every day. However, it is highly unlikely that a patient's overall response to the Hepatitis C course of treatment will significantly change if a patient occasionally misses a daily

6

dose of Ribavirin. (Dr. Ayers Affidavit, para. 11).

16. Ms. Porter did not give inmate Gillilan any medication on August 25, 2005. The MAR shows that on August 25, 2005, inmate Gillilan was not scheduled to receive his weekly Pegasus shot. Another nurse noted on the MAR that inmate Gillilan was a no-show to receive his morning dose of Ribavirin on August 25, 2005. Another nurse noted that on the MAR that inmate Gillilan did receive his nightly dose of Ribavirin on August 25, 2005. (Porter Affidavit, para. 6; MAR of August 2005).

17. Ms. Porter did not give inmate Gillilan any medication on August 29, 2005. The MAR shows that on August 29, 2005, inmate Gillilan was not scheduled to receive his weekly Pegasus shot. Another nurse noted on the MAR that inmate Gillilan was a no-show to receive his morning dose of Ribavirin on August 29, 2005. Another nurse noted that on the MAR that inmate Gillilan did receive his nightly dose of Ribavirin on August 29, 2005. (Porter Affidavit, para. 7; MAR of August 2005).

18. Ms. Porter did not give inmate Gillilan any medication on August 30, 2005. The MAR shows that on August 30, 2005, inmate Gillilan was not scheduled to receive his weekly Pegasus shot. Another nurse noted on the MAR that inmate Gillilan was a no-show to receive his morning dose of Ribavirin on August 30, 2005. Another nurse noted that on the MAR that inmate Gillilan did receive his nightly dose of Ribavirin on August 30, 2005. (Porter Affidavit, para. 8; MAR of August 2005).

19. Ms. Porter did not give inmate Gillilan any medication on September 9, 2005. The MAR shows that on September 9, 2005, inmate Gillilan was not scheduled to receive his weekly Pegasus shot. Another nurse noted on the MAR that inmate Gillilan was a no-show to receive his morning dose of Ribavirin on September 9, 2005. Another nurse noted that on the MAR that inmate Gillilan did receive his nightly dose of Ribavirin on September 9, 2005. (Porter Affidavit, para. 9; MAR of September 2005).

20. Ms. Porter did not give inmate Gillilan any medication on April 4, 2006. The MAR shows that on April 4, 2006, inmate Gillilan was not scheduled to receive his weekly Pegasus shot. Other nurses noted on the MAR that on April 4, 2006, inmate Gillilan did receive his morning and evening dose of Ribavirin. (Porter Affidavit, para. 10; MAR of April 2006).

21. The MAR shows that inmate Gillilan was not scheduled to receive his weekly Pegasus shot on April 5, 2006. The MAR reflects that on April 5, 2006, Ms. Porter did give inmate Gillilan his morning dose of Ribavirin, though another nurse gave him his nightly dose of Ribavirin. (Porter Affidavit, para. 11; MAR of April 2006).

22. Ms. Porter did not give inmate Gillilan any medication on May 4, 2006. The MAR shows that on May 4, 2006, inmate Gillilan was not scheduled to receive his weekly Pegasus shot. Other nurses noted on the MAR that on May 4, 2006, inmate Gillilan did

receive his morning and evening dose of Ribavirin. (Porter Affidavit, para. 12; MAR of May 2006).

23. The MAR shows that on May 5, 2006, another nurse gave inmate Gillilan his weekly Pegasus shot. The MAR reflects that on May 5, 2006, Ms. Porter did give inmate Gillilan his morning dose of Ribavirin, though another nurse gave him his nightly dose of Ribavirin. (Porter Affidavit, para. 13; MAR of May 2006).

24. The MAR shows that inmate Gillilan was not scheduled to receive his weekly Pegasus shot on June 12, 2006. The MAR reflects that on June 12, 2006, Ms. Porter did give inmate Gillilan his morning dose of Ribavirin, though another nurse gave him his nightly dose of Ribavirin. (Porter Affidavit, para. 14; MAR of June 2006).

25. The MAR shows that inmate Gillilan was not scheduled to receive his weekly Pegasus shot on June 13, 2006. The MAR reflects that on June 13, 2006, Ms. Porter did give inmate Gillilan his morning dose of Ribavirin, though another nurse gave him his nightly dose of Ribavirin. (Porter Affidavit, para. 15; MAR of June 2006).

26. Though the Plaintiff did not identify a date on which he had a seizure, fell and injured his head, his institutional medical records show that the only date on which he had a seizure and injured his head while at Calhoun State Prison was June 14, 2006. (Plaintiff's Institutional Medical Records, note of 6/14/06).

27. The Plaintiff's Institutional Medical records show that he was prescribed Tegretal for seizures in October 2005. The Plaintiff's Medication Administration Record shows that from October 14, 2005 until January 5, 2006, inmate Gillilan had to go to pill call to receive his Tegretal. During this time period, inmate Gillilan received his daily dose Tegretal nearly every day. In early January 2006, inmate Gillilan's Tegretal prescription was changed so that he did not have to go to pill call to pick it up on a daily basis; rather, his Tegretal prescription became a Self Administered Medication ("SAM"), and he was given a thirty day supply of Tegretal at a time so that he could give it to himself in his cell. When an inmate receives a SAM prescription, he is required to fill out a health services request form when the medication is running out so he can obtain his next supply of medication. (Porter Affidavit, para. 16; MAR records of October 2005 to January 2006).

28. The Plaintiff's institutional medical records show that on January 12, 2006, another nurse gave inmate Gillilan a thirty day supply of Tegretal. Ms. Porter gave inmate Gillilan another thirty day supply of Tegretal on March 8, 2006. The institutional pharmacy records show that thirty day supplies of Tegretal were filled for inmate Gillilan on January 11, 2006, February 6, 2006, March 6, 2006 and May 1, 2006. At no time has Ms. Porter ever refused to give inmate Gillilan his Tegretal or other medication. At no time has Ms. Porter ever been deliberately indifferent to his medical needs, nor has Ms. Porter ever denied him any medication. (Porter Affidavit, para. 17; SAM records).

Insofar as plaintiff's allegations agains Doctor Ayers are concerned, the above portions of defendants statement of materials facts as to which there is no genuine issue clearly shows that he was not deliberately indifferent to a serious medical need in his treatment of plaintiff for his Hepatitis C condition. Plaintiff had the two telemedical conferences with the infectious disease specialist he was required to have. Plaintiff was experiencing a good result in his treatment regimen and it was for Doctor Ayers to determine if he needed additional telemedical conferences, which in his medical opinion were not necessary or indicated.

Regarding plaintiff's seizure related complaints, it is noted that while at Calhoun State Prison he evidently experienced only one seizure and that was during the period of time when he was allowed to self administer the prescribed seizure medication. The fact that plaintiff wanted another seizure medication is not material as he has offered absolutely no evidence that the medication he wanted was more effective than the prescribed Tegretal. What more could Doctor Ayers do than to prescribe a seizure medication for an apparent seizure disorder? His treatment in this regard certainly does not rise to the level of deliberate indifference. "[A] simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment [does not] support a claim of cruel and unusual punishment." Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991). It is therefore the RECOMMENDATION of the undersigned that the motion for summary judgment be GRANTED as to the defendant Dr. Ayers.

Plaintiff's only claim against defendant Nurse Porter is her alleged failure to give him his oral medication on a few occasions. However, as shown above in the pertinent portion of defendants' statement of material facts, of the dates plaintiff alleges, there were only four occasions, August 25, 29, 30 and September 9, 2005, that he did not receive his morning does of

9

medication. As further shown this was due entirely to his failure to attend morning pill call. It is therefore the RECOMMENDATION of the undersigned that the motion for summary judgment likewise be GRANTED to defendant Nurse Porter.

*Defendant Nurse Rhonda Wright*

As earlier stated, this defendant did not acknowledge service of the complaint nor has she been personally served. Under normal circumstances personal service would have been ordered for this defendant. However, to do so now amounts to an exercise in futility. Plaintiff alleges that on only three occasions, August 1, 27, and 28, 2005, defendant Wright did not give him his medication. While defendants' statement of material facts does not address these dates, "it is highly unlikely that a patient's overall response to the Hepatitis C course of treatment will significantly change if a patient occasionally misses a daily dose of Ribavirin." (Dr. Ayers Affidavit, para. 11).

It also appears that plaintiff did not exhaust his administrative remedies as to this defendant, which is required by the Prison Litigation Reform Act prior to seeking relief in Federal Court. 42 U.S.C. § 1997e(a). Paragraphs 31 through 35 of the defendants' statement of material facts clearly show that the plaintiff failed to file a grievance as to anything defendant Nurse Wright did or did not to relative to plaintiff's health care needs. This being the case, it is likewise the RECOMMENDATION of the undersigned that defendants' motion for summary judgment be GRANTED as to defendant Wright.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may file written objections to this recommendation with the Honorable W. Louis Sands, United States District Judge, WITHIN TEN (10) DAYS of receipt thereof.

**SO RECOMMENDED,** this 16th day of June 2008.


                                      */s/ Richard L. Hodge*
                                      RICHARD L. HODGE
                                      UNITED STATES MAGISTRATE JUDGE